**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| James S. Miller,<br><br>                Plaintiff,<br><br>v.<br><br>Nancy A. Berryhill,<br>Acting Commissioner of Social Security,<br><br>                Defendant. | No. CV-17-0385-TUC-BGM<br><br><br>**ORDER** |

Currently pending before the Court is Plaintiff's Brief (Doc. 17). Defendant filed her Brief ("Response") (Doc. 18), and there was no reply. Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). Compl. (Doc. 1). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

## I.    BACKGROUND

### A.    *Procedural History*

On March 23, 2012, Plaintiff filed a Title II application for Social Security Disability Insurance Benefits ("DIB") alleging disability as of December 31, 2010 due to degenerative arthritis and type 2 diabetes mellitus. *See* Administrative Record ("AR") at 19, 21, 32, 35, 39–43, 47–49, 52, 55, 62, 122, 129, 141, 155, 172, 180, 632. Plaintiff's

date last insured is June 30, 2016. *Id.* at 21, 40, 48, 141, 170, 178, 476. The Social Security Administration ("SSA") denied this application on July 2, 2012. *Id.* at 19, 39–46, 55–57. On July 17, 2012, Plaintiff filed a request for reconsideration, and on November 29, 2012, SSA denied Plaintiff's application upon reconsideration. *Id*. at 47–54, 58, 62–64. On December 17, 2012, Plaintiff filed his request for hearing. *Id.* at 19, 65–66. On June 24, 2013, a hearing was held before Administrative Law Judge ("ALJ") Peter J. Baum. AR at 19, 28–38. On July 22, 2013, the ALJ issued an unfavorable decision. *Id.* at 16–24. On August 29, 2013, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on November 26, 2014, review was denied. *Id.* at 1–3, 13. On January 22, 2015, Plaintiff filed a complaint in the United States District Court, District of Arizona. Case No. CV-15-030-TUC-BGM, *Miller v. Colvin*; *see* AR at 572–620. On March 31, 2016, the undersigned issued an Order reversing the ALJ's decision and remanding for further proceedings and analysis beyond Step Two of the sequential evaluation. AR at 597–620.

On May 9, 2016, the Appeals Council notified Plaintiff that the matter had been returned to the ALJ. *Id.* at 621–23. On September 21, 2016, a second hearing was held before the ALJ; however, at this time ALJ Yasmin Elias was substituted in place of ALJ Baum. *Id.* at 491–526. The Vocational Expert was unavailable to testify at this hearing. *See id.* at 491–526, 529–30. As such, a supplemental hearing took place on April 3, 2017. *Id.* at 527–52. On July 22, 2013, the ALJ issued her unfavorable decision. AR at 471–82. On August 9, 2017, Plaintiff filed his Complaint (Doc. 1) in this matter seeking review pursuant to Section 405(g), Title 42, United States Code. *See* Compl. (Doc. 1).

### B.  *Factual History*[1]

Plaintiff was sixty-two (62) years old at the time of the first administrative hearing, sixty-six (66) at the time of the second administrative hearing, as well as the third hearing, and sixty (60) at the time of the alleged onset of his disability. AR at 31,

---

[1] Much of the factual history was initially outlined in the Court's March 31, 2016 Order. It is repeated here for completeness, with the addition of events occurring since the prior remand.

39–40, 47–48, 122, 141, 170, 178, 474, 480, 491, 498, 527. Plaintiff obtained a high school diploma. *Id.* at 31, 39, 47, 156. Prior to his alleged disability, Plaintiff worked in the copper mining industry, most recently as a maintenance superintendent. *Id.* at 32, 132–34, 156, 164–69, 186–88. Since that time he has worked briefly at Lowe's Home Improvement. *Id.* at 33–34, 140, 148, 186, 188.

### 1. Plaintiff's Testimony

#### a. Administrative Hearing

##### *i. June 24, 2013*

At the administrative hearing, Plaintiff testified that he has a high school diploma. AR at 31. Plaintiff further testified that he worked in the copper mining industry as a maintenance superintendent until he retired in December 2010. *Id.* at 32. Plaintiff was a working superintendent, supervising sixty-five (65) people. *Id.* at 33. Plaintiff also testified that his legs and feet gave him trouble, and he was on his feet most, if not all of his shift, carrying pipes and other equipment. *Id.* After retirement, Plaintiff worked at Lowe's for a short period; however, his feet were too painful standing on the concrete floor for an entire shift, so he resigned. *Id.* at 33–34.

Plaintiff confirmed that he is receiving some retirement income. AR at 34. Plaintiff also confirmed that if he tried to return to his former mining employment, he would be unable to perform the job due to having to be on his feet most of the day. *Id.* at 34–35. Plaintiff testified that he was diagnosed with arthritis in his thumb joint, including two nodules on the tendon approximately three (3) weeks prior to the hearing. *Id.* at 35.

##### *ii. September 21, 2016*

Plaintiff testified that his alleged onset date coincided with the date that he retired from the copper mines. AR at 498. Plaintiff noted that he was fifty-nine and a half (59 1/2) at the time of his retirement. *Id.* Plaintiff described the circumstances of his retirement as being brought into the office and told that he was not doing his job, and being given a choice of either retiring or being fired. *Id.* Plaintiff further noted that he

had "a lot of medical issues at that time." *Id.* Upon further examination, Plaintiff explained that management did not feel Plaintiff was spending enough time in the office, because he was out doing other things on site rather than sitting at his desk. *Id.* at 516–18. Plaintiff further explained that management did not like him being out of contact, away from his phone. AR at 518.

Plaintiff testified that he was a superintendent of the crushing and conveying department of Freeport McMoran Copper and Gold at that time. *Id.* at 498–99. Plaintiff described his job duties as desk work, which included doing budgets for the crushing materials, as well as "keeping track of 160 people." *Id.* at 499. Plaintiff further explained that keeping track of people included walking plans for jobs out to the planners, and checking on each job at least once a day. *Id.* at 499, 504. Plaintiff testified that he would walk around the crushing and conveying building, but the remainder of his out of office responsibilities entailed driving. *Id.* at 499–500. Plaintiff estimated that he would also lift approximately fifty (50) to sixty (60) pounds multiple times per day. AR at 504. Plaintiff further testified that he worked as the superintendent for five (5) years. *Id.* at 500. Prior to working as a superintendent, Plaintiff worked for seven years as a planner, during which time he "planned all the jobs and made sure all the parts [were] there and delivered parts to the site where the job was." *Id.* Plaintiff estimated that the planner job was comprised of approximately "25% sitting doing plans" and the remainder "was out delivering parts to the worksite and checking on the jobs to see where they were so [he] could report back to the superintendent." *Id.* at 500.

Plaintiff testified that when he stopped working in 2010, he had diabetes and in 2007 had two stents put in and an ablation in his heart. *Id.* at 502. Plaintiff further testified that the heart surgery improved his overall health greatly. AR at 503. Plaintiff also testified that the diabetes caused neuropathy, as well as his feet and legs to ache if he walked or stood on concrete for long. *Id.* Plaintiff estimated that in 2010 the neuropathy encompassed his feet and just above his ankles, but has progressed up to his knees. *Id.* at 504–05. Plaintiff described the pain as generally burning, but with occasional, sharp,

sudden pain.  *Id.* at 505.  Plaintiff also described pain in his hips in 2010 as traveling across the lower part of his back, which makes it difficult to stand up when he gets out of bed in the morning and would increase when he was walking on concrete.  *Id.* at 505, 507.  Plaintiff further noted that he could not run.  *Id.* at 506.  Plaintiff rated his hip and lower back pain as an eight (8) or nine (9) out of ten (10).  AR at 507–08.  Plaintiff testified that he did not suffer pain sitting as much in 2010, as currently, noting that he could spend quite a bit of the 25% of his day doing paperwork before needing to get up and walk.  *Id.* at 506.  Plaintiff clarified that his back pain is in his low back and coextensive with his hip pain.  *Id.* at 508.  Plaintiff testified that since 2010, he can only sit for approximately fifteen (15) minutes at a time before he needs to stand up and walk or squirm in his seat.  *Id.* at 508–09.  Similarly, Plaintiff stated that he can only stand for approximately fifteen (15) minutes at a time before his back and legs begin to hurt.  *Id.* at 509.  Plaintiff noted that this pain had existed since 2009 or 2010.  AR at 509.  Plaintiff also estimated that since 2010, he can walk about three-quarters of a block before he needs to stop, and if possible, sit down.  *Id.*  Plaintiff stated that it was more painful to sit in the office; however, it was also his personal philosophy that he needed to be out on the floor, checking jobs.  *Id.* at 519.  Plaintiff testified that he has only had two (2) physical therapy appointments, and was given exercises for his back for getting out of bed.  *Id.* at 514.  Plaintiff confirmed that he has been doing the exercises.  *Id.*  Plaintiff stated that his hip and back pain do not feel mild.  AR at 514.  Plaintiff stated that he did not have neuropathy in his hands in 2010, but that it started about four (4) years ago, and causes him to drop things often.  *Id.* at 506.

Plaintiff testified that he limits himself to lifting and carrying approximately ten (10) pounds, although he does not think that any doctors have instructed such a limitation.  *Id.* at 509.  Plaintiff noted that he limits himself to ten pounds, because even if he can pick something up, he feels pain later on that night.  *Id.*  Plaintiff stated that he and his wife do the grocery shopping, and the he does approximately twenty-five (25) percent of the housework.  *Id.* at 510.  Plaintiff testified that he helps with the dusting and

vacuuming, but in fifteen (15) minute increments. AR at 510. Plaintiff further testified that twisting and climbing stairs also exacerbate his pain. *Id.* at 510–11. Plaintiff indicated that he was compliant with his prescriptions. *Id.* at 511.

Plaintiff testified that he worked at Lowe's for two (2) months during 2012. *Id.* at 512. Plaintiff further testified that he worked approximately twenty (20) hours per week on Friday, Saturday, and Sunday. *Id.* Plaintiff described the position as walking around and assisting people; however, he could not maintain the constant walking. AR at 512. Plaintiff also opined that he did not believe that he could perform work that required sitting, because he has to get up and move every fifteen (15) minutes due to back and leg pain. *Id.* at 512–13. Plaintiff further opined that his pain interferes with his mental functioning, although he has not received any therapy or prescriptions for the same. *Id.* at 513.

### ii. April 3, 2017

Plaintiff again testified about his work at Lowes after leaving the copper mines. AR at 533. Plaintiff confirmed that he was only at Lowes for approximately two (2) months. *Id.* at 535. Plaintiff further testified that he could not continue in that position because the constant walking caused pain in his feet and legs. *Id.* at 533, 535. Plaintiff further described his job duties at the mine, explaining that it was an office job that required him to go out to check on his people. *Id.* at 533. Plaintiff also explained that although he did hire and fire, most of that task was left to the planners who worked for him. *Id.* Plaintiff estimated that he would spend approximately four (4) hours per day in the office. AR at 533, 535–36. Plaintiff further estimated that he would have to lift approximately fifty (50) to seventy-five (75) pounds. *Id.* at 534. Plaintiff also explained that his subordinates would produce budgets and schedules, but he would present the information to management. *Id.* at 534.

Plaintiff clarified that the planner job and general coordinator job that he listed in his work history were the same job, but the mining company had changed the title. *Id.* at 539–41. He further explained that in those positions, he was coordinating maintenance

on equipment and coordinating materials. *Id.* at 541. Plaintiff indicated that in the supervisor position, he had to have knowledge of every job, but did not supervise every job. AR at 542. Plaintiff also acknowledged spending the last approximately nine (9) months of his employment as a mechanic in a different section of the mine. *Id.* at 542–43.

### b. Administrative Forms

On June 11, 2012, Plaintiff filled out an Exertional Daily Activities Questionnaire, indicating that on an average day he "walk[s] around for approx: 30 min[utes.]" *Id.* at 161. Plaintiff reported that "as pain gets worse steps shorten and take more rest stops use [A]dvil for pain no more than 2-200 mg tabs a day." AR at 161. Plaintiff further reported "[b]roncides night sweats use of inhailer [sic] 3-x a day[,] still have shortness of breath." *Id.* Plaintiff indicated that he grocery shops, as well as household chores including "vacuum[ing], dust[ing], dishes, clean[ing] toilet and showers[,] mop[ping] floors, clean[ing] appliances (stove, ref[rigerator], dish washer)." *Id.* at 162. Plaintiff reported that he must "quit after each chore to rest." *Id.* Plaintiff further reported being able to drive a car. *Id.* Plaintiff also indicated that he cleans the yard, provides for two (2) dogs, waters the garden, and mows the grass. AR at 162. Although he did these chores prior to becoming disabled, Plaintiff states that now "it takes a lot longer, if not the next day." *Id.* Plaintiff reports resting for two (2) hours "halfway through the day." *Id.* Plaintiff lists several medications and indicates that he also had stents placed in his coronary arteries, has diabetes, pain in his knees and ankles, and requires the use of an inhaler. *Id.* at 163.

On appeal, Plaintiff completed a Disability Report – Appeal (Form SSA-3441), indicating that he has "arthritis in both ankles and Neuritis in both feet." *Id.* at 172. Plaintiff reported that "the degenerative arth[r]itis has gotten worse in both . . . hips and back." AR at 172. Additionally, Plaintiff stated that the "condition with [his] hips and back and feet has hindered the activities with [his] grandkids[,] [and] the pain in [his] hips and back have gotten worse and [his] feet has slowed [him] down from being active,

walks and jogging[.]" *Id*. at 176.

## 2. Vocational Expert Sonia Peterson's Testimony

Ms. Sonia Peterson testified as a vocational expert at the administrative hearing. AR at 474, 536–49. Ms. Peterson described Plaintiff's past work of planner and general coordinate as a composite job comprised of material coordinator, Dictionary of Occupational Titles ("DOT") number 221.167-014, Specific Vocational Preparation ("SVP") of 6, light exertion per the DOT, but heavy as performed. *Id.* at 543. Ms. Peterson described the other part of the composite as a title repairer, DOT number 630.281-022, an SVP of 6, medium work per the DOT, but heavy as performed. *Id.* at 543–44. Ms. Peterson described Plaintiff's past work of supervisor as a section supervisor was a composite of section supervisor and title repairer. *Id.* at 544–45. The section supervisor position was described as DOT number 939.137-018, SVP of 7, medium work per the DOT, but heavy as performed. *Id.* at 544. Ms. Peterson testified that Plaintiff's mechanic position would be the title repairer definition alone. AR at 545.

The ALJ asked Ms. Peterson to consider a hypothetical individual with the same age at the alleged onset, 60 years of age, and same education and work history as Plaintiff, and assume that the individual could work at the medium exertion level, but the work would only occasionally require climbing, ladders, ropes, or scaffolds; may frequently require climbing ramps and stairs, stooping, kneeling, crouching, only occasional crawling. *Id.* at 545. Ms. Peterson testified that Plaintiff would not be able to perform his past relevant work as it was actually performed, but per the DOT such an individual could perform the material coordinator position, even composite with repairer, as well as the section supervisor. *Id.* at 546. The ALJ then asked a second hypothetical assuming the same individual, but who is limited to light work. *Id.* Ms. Peterson testified that there was no past work available to such an individual. *Id.* Ms. Peterson further testified that the transferrable skills at the light exertion level would include using the telephone, writing reports, coordinating materials, coordinating personnel, scheduling, maintaining records, and other clerical tasks. AR at 546–47. Ms. Peterson

stated that despite these jobs having been gained in a specialized environment, especially since the past work was at a supervisor level, such skills would be transferrable. *Id.* at 548–49.

The ALJ inquired about possible jobs for an individual closely approaching retirement age, in the light exertion level, that included the transferrable skills previously outlined, and with very little vocational adjustment. *Id.* at 547. Ms. Peterson stated that available jobs included general clerk, DOT number 209.562-010, light exertion, SVP of 3, and approximately 200,000 jobs available in the national economy; file clerk I, DOT number 206.387-034, light exertion, an SVP of 3, and approximately 200,000 jobs available nationally; and appointment clerk, DOT number 237.367-010, sedentary exertion, an SVP of 3, and 120,000 jobs available in the national economy. *Id.* Ms. Peterson further testified that although "off task" is not specifically addressed in the DOT other occupational classifiers, in her experience if an individual is off task more than 10% of the workday on a consistent basis, there is no work available. *Id.* Similarly, based on her experience, if a person is absent more than one day, or eight (8) hours, a month on a consistent basis, there is no work available. AR at 547–49.

### 3. Plaintiff's Medical Records

#### a. Treatment records

On December 10, 2009, Plaintiff saw Imran Ata, M.D. at Pima Health for a follow-up regarding his "P[ercutaneous] T[ransluminal] C[oronary] A[ngioplasty] of osteal disease of P[atent] D[uctus] A[rteriosus] and stent to mid R[ight] C[oronary] A[rtery] eccentric plaque last month." AR at 381–83. Plaintiff's physical examination was unremarkable. *Id.* at 381. On April 8, 2010, Plaintiff followed-up with Dr. Ata for his Coronary Artery Disease and Hyperlipidemia. *Id.* at 379–80, 393–94. Plaintiff reported "[d]oing very well" and that he had been taking Toprol XL. *Id.* at 379, 393. Plaintiff's physical examination was unremarkable. *Id.* at 380, 394. Dr. Ata continued Plaintiff's current medical therapy, but decreased his Aspirin dosage to 81 mg daily. AR at 380, 394. On July 8, 2010, Plaintiff followed-up with Dr. Ata. *Id.* at 377–78, 391–

92.  Plaintiff reported "feeling fine."  *Id.* at 377, 391.  Plaintiff's physical examination was unremarkable, and his treadmill test normal.  *Id.* at 378, 392.

The majority of Plaintiff's treatment occurred at the Southern Arizona Veterans Affairs Health Care System ("SAVAHCS").  On April 4, 2011, Plaintiff was seen by Licensed Nurse Practitioner ("LPN") Janet Haliburton for a routine check-up including obesity screening and diabetic foot exam.  AR at 302–5.  Plaintiff is a smoker and was counseled regarding preventative medicine.  *Id.* at 304.  Plaintiff also saw Adult Nurse Practitioner ("ANP") Randi Schmeling this same date.  ANP Schmeling noted Plaintiff's history of stents, diabetes mellitus, hypertension, hyperlipidemia, benign prostatic hyperplasia, and that he used to see an oncologist regarding elevated white blood cells, but he has not seen one in two (2) years.  *Id.* at 298.  A review of Plaintiff's systems was unremarkable, and his current medications included glipizide, lisinopril/hydrochlorothyazide, metformin, metoprolol, simvastatin, and terazosin.  *Id.* at 299.  Plaintiff also reported that he "was put on [L]antus 10 units at bedtime" and takes Vitamin C, aspirin, and a multivitamin.  *Id.* at 298–300.  On April 27, 2011, Plaintiff was instructed on insulin injections and diet by Lordes L. Mulick, RN.  AR at 292–94.

On May 3, 2011, Plaintiff was informed that his laboratory results were normal.  *Id.* at 292, 302.  On May 4, 2011, Nurse Mulick called Plaintiff to follow up regarding his blood sugar for Diabetes management.  *Id.* at 288.  Nurse Mulick also "[r]einforced teaching of low fat, low sugar, low carb diet and exercise.  *Id.* On May 19, 2011, Nurse Mulick again called Plaintiff regarding his diabetes management and provided additional instruction regarding blood sugar checks and medication.  *Id.* at 284.  On May 25, 2011, Nurse Mulick called Plaintiff to instruct him to increase his Lantus dose.  AR at 285.

On June 8, 2011, Plaintiff called and spoke with Nurse Mulick regarding his blood sugar readings.  *Id.* at 283.  On June 30, 2011, Nurse Mulick had a telephone consult with Plaintiff regarding his blood sugar readings.  *Id.* at 281–82.  On July 7, 2011, Nurse Mulick confirmed an increase in Plaintiff's Lantus dosage.  *Id.* at 282.  On July 21, 2011, Plaintiff was again seen by Dr. Ata at Pima Heart regarding his Coronary Artery Disease.

*Id.* at 375–76, 389–90, 398–99. Pima Heart records indicate that Plaintiff had an angioplasty with stent placement in November 2009. *Id.* at 375, 398, 389. Plaintiff's physical examination was unremarkable. AR at 376, 390, 399. Dr. Ata made no changes to his current regimen. *Id.* On August 3, 2011, Nurse Mulick telephoned Plaintiff to follow up regarding his blood sugar readings. *Id.* at 275–76. On August 24, 2011, Plaintiff underwent a pulmonary function test. *Id.* at 221–22, 306–07. The report indicates that this was a "[n]ormal study without obstruction and restriction." *Id.* at 221, 306. The report further notes that "[t]here is significant [bronchodilator] response at the small airways level with mild evidence of air trapping on lung volumes." AR at 222, 307. On August 25, 2011, ANP Schmeling spoke with Plaintiff regarding his pulmonary function test results, advising him that he "needs to quit smoking[.]" *Id.* at 274. Plaintiff declined a referral or medication, and ANP Schmeling indicated that Plaintiff would benefit from an inhaler, which he also declined. *Id.* On the same date, Nurse Mulick also followed up with Plaintiff regarding his blood sugar readings. *Id.* at 274–75.

On November 2, 2011, Plaintiff was seen for an influenza shot. *Id.* at 267. On November 2, 2011, Plaintiff saw ANP Schmeling for a checkup. AR at 263. ANP Schmeling noted that Plaintiff was "doing well; no concerns." *Id.* ANP Schmeling's review of Plaintiff's systems was unremarkable except for a lesion on his left shoulder. *Id.* at 264. Aside from the prescriptions for checking his blood sugar levels and insulin, Plaintiff's medications remained unchanged from April 4, 2011. *Id.* Plaintiff indicated that he had stopped smoking approximately nine (9) days prior to the appointment. *Id.* at 263. On November 18, 2011, ANP Schmeling had a telephone consult with Plaintiff regarding nicotine patches. AR at 260. Plaintiff was offered a referral to psychology cessation classes, but declined. *Id.* On December 16, 2011, Plaintiff was seen by Daniel C. King, PA-C regarding his left shoulder lesion. *Id.* at 219, 256. A waist-up dermatological exam was performed. *Id.*

On January 5, 2012, Nurse Mulick contacted Plaintiff, reporting that his lab work was within normal limits with the exception of his triglycerides which were high. *Id.* at

253, 266. On March 15, 2012, Plaintiff was seen by ANP Schmeling for right hip pain for approximately three (3) weeks. AR at 248. Plaintiff reported that he bought special shoes, but they did not help. *Id.* Plaintiff quit the job. *Id.* Plaintiff indicated the pain was at the right top of the iliac crest and that he thought he might be developing neuropathy in his feet. *Id.* Plaintiff reported that he was not taking any pain medications. *Id.* at 248. ANP Schmeling's physical examination indicated "tenderness right lumbar paraspinals about L3–5 [on palpation]; pain with flexion; sensation/strength intact . . . [bilaterally;] neg[ative] [straight leg raise.]" AR at 250. ANP Schmeling reported that Plaintiff's right hip had "tenderness at top of iliac crest; good [range of motion]; mild pain with internal rotation of hip in flexion." *Id.* ANP Schmeling ordered x-rays of Plaintiff's back and hip, discussed weight loss with Plaintiff and how it would help his Diabetes and back. *Id.* Plaintiff declined "nutrition or MOVE[,]" as well as ANP Schmeling's offer of physical therapy. *Id.* Plaintiff reported that over-the-counter ibuprofen works. *Id.* at 250. On March 19, 2012, Plaintiff had lumbosacral and hip x-rays taken. AR at 198–201. The radiology report indicates "[h]ypertrophic lumbar spondylosis . . . associated with advanced degenerative changes of the L4–L5 and L5–S1 discs, associated with facet arthropathy at the same levels." *Id.* at 198. The report further indicated "[m]ild D[egenerative] J[oint] D[isease] of both the S[acro]I[liac] joints is present." *Id.* Additionally, "[a]theromatous calcification of the infrarenal aorta are present with minimal A[bdominal] A[ortic] A[neurysm] formation." *Id.* The radiology impression reports "[n]o acute osseous or soft tissue pathology[;] . . . [d]egenerative changes lumbar spine[;] . . . [a]neurysmal dilatation infrarenal aorta[;] . . . [and] [p]ossible cyst, inferior pole left kidney." *Id.* at 199. The radiology report for Plaintiff's right hip indicates that "[b]ones joints and soft tissues are intact[,] [n]o lytic or blastic changes identified." *Id.* at 200. The report further indicates that "[t]here are moderate degenerative changes of the lower lumbar spine, sacroiliac and hip joints bilaterally[,] [and] [a]theromatous vascular calcifications are seen within the soft tissues." AR at 200. On March 22, 2012, ANP Schmeling discussed x-rays and aneurysm with Plaintiff. *Id.* at

248. Plaintiff declined physical therapy and indicated he would get an ultrasound in six (6) months to follow the aneurysm. *Id.* On March 28, 2012, Plaintiff was seen by Marshall Palmer, OD for a diabetic teleretinal imaging consult. *Id.* at 246–47. These results were normal. *Id.* at 245.

On April 27, 2012, Plaintiff was seen by Shilpi Ratra, OD, overseen by Gregory S. Wolfe, OD, MPH, for a biennial Diabetes Mellitus vision examination. AR at 243–45. Plaintiff's vision examination was unremarkable. *See id.* On May 14, 2012, Plaintiff saw ANP Schmeling. *Id.* at 238–41, 363–66. ANP Schmeling's review of Plaintiff's system indicated that he was "doing well" and was otherwise unremarkable. *Id.* at 238–40, 363–65. ANP reported reviewing Plaintiff's medications, which remained unchanged, as well as his laboratory results, with Plaintiff. *Id.* at 240, 365. ANP Schmeling discussed weight control and offered nutrition and MOVE, which were again declined. AR at 240, 365. Kathleen Hutson, LPN completed a diabetic foot exam. *Id.* at 241, 366. Plaintiff's left foot had decreased sensation on the bottom of the foot, and his right foot had decreased sensation on top of toes, except for the little toe. *Id.* Plaintiff reported a dull ache in his lower back and hips for approximately three (3) months. *Id.* at 242, 367. Plaintiff reported his pain level as a four (4). *Id.* Plaintiff additionally reported that this pain was exacerbated with standing. AR at 242, 367. On May 30, 2012, Plaintiff had a telephone consult with Nurse Mulick regarding cough and congestion. *Id.* at 234–35, 359–60. Nurse Mulick also reviewed Plaintiff's blood sugar readings. *Id.* at 232–34, 358–59. On May 31, 2012, ANP Schmeling examined Plaintiff regarding his cough and congestion. *Id.* at 230–32, 355–57. ANP Schmeling also spoke with Plaintiff regarding his chest x-ray. *Id.* at 232, 357. X-ray was negative for pneumonia, but there was a question between pneumonitis versus bronchitis. AR at 197, 232, 318, 357. "No significant active cardiopulmonary disease [was] identified." *Id.* at 317. ANP Schmeling prescribed a z-pack and a follow-up x-ray in six (6) weeks. *Id.* at 232, 357.

On June 5, 2012, Plaintiff called complaining that his cough was not improved after the Z-pack. *Id.* at 227–29, 352–354. On June 6, 2012, Plaintiff saw Nurse Mulick

regarding his chest congestion and cough. *Id.* at 226–27, 351–52. Plaintiff indicated that he had previously declined the use of inhaler, but is now willing to use one. AR at 226, 351. On June 12, 2012, Nurse Mulick had a telephone consult with Plaintiff regarding his blood sugar. *Id.* at 347–348. On June 13, 2012, Nurse Mulick had another telephone consult with Plaintiff regarding his cough. *Id.* at 346–347. Plaintiff reported using his inhaler when he feels shortness of breath and that the "inhaler helps really good." *Id.* at 346. On June 19, 2012, Nurse Mulick had a telephone consult with Plaintiff regarding his blood sugar and increased his Lantus. *Id.* at 345. Plaintiff denied any symptoms. AR at 345. On June 21, 2012, Plaintiff was notified that his follow-up chest x-ray was normal. *Id.* at 344–45. On June 29, 2012, Nurse Mulick followed up telephonically with Plaintiff regarding his blood sugar. *Id.* at 343–44.

On July 10, 2012, Plaintiff saw ANP Schmeling regarding his foot and left ankle pain. *Id.* at 340–43. Plaintiff reported "left ankle pain since June . . . [and] both feet hurt[.]" *Id.* at 340. Plaintiff further reported that his feet hurt when standing, and the pain is worse in the morning. AR at 340. Plaintiff indicated he was not taking any pain medication. *Id.* On July 17, 2012, Plaintiff saw Steven M. Hoffman, DPM regarding his bilateral foot and ankle pain. *Id.* at 337–40. Plaintiff reported "that the pain comes and goes." *Id.* at 337. Plaintiff further "describe[d] the pain as some times his feet 'burn' and sometimes [it] feel[s] like they are 'freezing' and sometimes he gets 'pins and needles[.]'" *Id.* Plaintiff indicated that "he is not taking anything for his neuropathy but would like to talk to primary care about it." AR at 337. DPM Hoffman's review of Plaintiff's systems indicated "[n]o first step pain[,] . . . [Plaintiff] [d]enies pain on ambulation, hot/cold sensation[,] [and] . . . no pain, numbness, [or] tingling[.]" *Id.* DPM Hoffman's physical examination was unremarkable. *Id.* at 338. X-rays of Plaintiff's feet showed "mild degenerative finding the first and second M[etatarsophalangeal] joints[,] [m]arginal erosion in the great toe metatarsal head medially could be degenerative in nature although the differential would include gout[,] [and] [t]here are small calcaneal enthesophytes." *Id.* at 315–16, 338. Regarding these findings, the report indicates "[m]ild degenerative

findings[;] [t]here is [a] small erosion in the great toe metatarsal head[;] [c]orrelate clinically in regards to any evidence for gout." *Id.* at 315–16,328–29, 338. Plaintiff's left ankle showed "[s]eparate ossification and spurring about the tip [of] the medial malleolus are likely the sequela of old trauma[;] [a]nkle mortise is symmetric and the joint space preserved[;] [t]here is mild spurring off the distal tibia anteriorly and posteriorly[;] [p]unctate metallic density overlies Kager's fat pad on the lateral radiograph." AR at 314, 329, 338–39. As such, there were "[m]ild degenerative findings." *Id.* at 314, 329, 339. Plaintiff's right ankle showed "[a]nkle mortis is symmetric and the joint space preserved[,] [t]here is minimal spurring off the tip of the medial malleolus[,] [and] [t]here is a plantar calcaneal enthesophyte." *Id.* at 313, 330, 339. Plaintiff was given orthotics and the x-ray findings, proper foot care, and proper shoe gear were discussed. *Id.* at 330, 339. On July 19, 2012, Plaintiff saw Dr. Ata for a follow-up. *Id.* at 372–74, 386–88. Plaintiff reported chest pain that remained for a half day and resolved with three (3) Aspirin. AR at 372, 386. Plaintiff also reported not exercising much. *Id.* Plaintiff's physical examination was otherwise unremarkable. *Id.* at 373, 387. On July 27, 2012, Nurse Mulick had a telephone consult with Plaintiff regarding his blood glucose readings. *Id.* at 335–36. Plaintiff's morning insulin was increased. *Id.* at 336.

On August 2, 2012, Plaintiff underwent a Myocardial Perfusion Imaging ("MPI") study. AR at 384–85, 395–97. Dr. Ata reported a "[n]ormal myocardial perfusion scan." *Id.* at 384, 395, 397. On September 6, 2012, Plaintiff underwent an ultrasound to follow-up regarding his infrarenal aneurysm. *Id.* at 312. No abdominal aortic aneurysm was noted. *Id.*

On November 5, 2012, ANP Schmeling had a telephone consult with Plaintiff regarding his lab work. *Id.* at 331–33. On November 6, 2012, ANP Schmeling informed Plaintiff that his ultrasound was "negative for an aneurysm." AR at 334. On November 20, 2012, Plaintiff received a flu shot and discussed insulin injections with Nurse Mulick. *Id.* at 468–69. On November 26, 2012, Plaintiff called regarding high blood sugar which he was unable to control. *Id.* at 465–66. Nurse Mulick followed regarding his blood

sugar the same day. *Id.* at 464–65. On December 7, 2012, Nurse Mulick had a telephone consultation with Plaintiff regarding his blood sugar. *Id.* at 461–63. On December 13, 2012, Nurse Mulick again followed-up telephonically regarding Plaintiff's blood sugar readings. AR at 460–61. On December 20, 2012, Nurse Mulick had another telephone consult with Plaintiff regarding his blood sugar, and increased his insulin. *Id.* at 459–60.

On January 24, 2013, Nurse Mulick consulted with Plaintiff regarding his blood sugar and reviewed his diet. *Id.* at 451–52. On February 14, 2013, Nurse Mulick reviewed Plaintiff's blood sugar and reinforced the need to monitor his diet closely. *Id.* at 450–51. On February 19, 2013, Plaintiff underwent a Diabetic Teleretinal Reader Consult, which was unremarkable. *Id.* at 446–48. On February 21, 2013, Nurse Mulick consulted with Patient regarding his blood sugar. AR at 446. On February 28, 2013, Plaintiff saw ANP Schmeling stating that he "does not know why he is here; says 'someone' made this appt for him." *Id.* at 441. ANP Schmeling indicated that Plaintiff had "gained a significant amt of weight since last visit." *Id.* ANP Schmeling assessed poorly controlled type II diabetes mellitus, right shoulder tendonitis, and obesity. *Id.* at 443. ANP Schmeling's treatment plan included over-the-counter nonsteroidal anti-inflammatory drugs (NSAIDs) and range of motion exercises for Plaintiff's shoulder. *Id.* ANP Schmeling also discussed physical therapy so that Plaintiff could learn core strengthening exercises, but Plaintiff declined. AR at 443. Additionally, ANP Schmeling reviewed Plaintiff's diet and gave suggestions regarding the same. *Id.*

On March 1, 2013, Nurse Mulick consulted with Plaintiff regarding his blood sugar. *Id.* at 440. On March 8, 2013, Nurse Mulick again consulted with Plaintiff regarding his blood sugar readings, which showed improvement. *Id.* at 339. On March 18, 2013, Nurse Mulick followed-up with Plaintiff regarding his blood sugar. *Id.* at 438–39. Plaintiff reported that "he continue[d] to closely monitor his diet and continue[d] to be active and regular exercise." AR at 438. On March 28, 2013, Plaintiff "attended a group enrollment class for the Home Telehealth (HT) Diabetes Program. *Id.* at 437. Plaintiff also enrolled in the Care Coordination Home Telehealth ("CCHT") program for

his diabetes. *See id.* at 427–436.

On April 23, 2013, Plaintiff had radiographs of his right hand. *Id.* at 843. Alan M. Lesselroth, M.D. read Plaintiff's films, and noted "[n]o fractures lytic or blastic osseous changes identified[;] . . . there is narrowing of the second metacarpophalangeal joint[;] [t]here is also mild degenerative arthrosis of the first carpometacarpal joint[;] [t]he narrowing of the MCP joint may be associated with [Calcium Pyrophosphate Dihydrate] disease[;] [the] [r]emainder of examination is otherwise unremarkable. *Id.* On June 11, 2013, Plaintiff was seen by William Lau, PA at the SAVAHCS regarding soreness in his right thumb and "catching." AR at 1034–35. Plaintiff received an injection of depomedrol and xylocaine. *Id.* at 1035. Other appointments at SAVAHCS during the time period of March through June 2013 were related to ongoing management of Plaintiff's diabetes. *Id.* at 1036–53. On July 23, 2013, Plaintiff reported to Ana Araiza-Rojas, RD, CDE at SAVAHCS that he had been "focusing on his diet more and continues to exercise daily." *Id.* at 1027. SAVAHCS records through the end of 2013 generally focus on management of Plaintiff's diabetes and other general wellness issues. *Id.* at 982–1026. Of note, on October 30, 2013, Plaintiff was seen at SAVAHCS and reported working on his diet, and that "he walks daily and stay[s] very active at home." AR at 993.

On January 7, 2014, Plaintiff reported to Kathryn Kerr, RN at SAVAHCS that he suffered right shoulder pain approximately three (3) times per week when lifting his arm overhead; however, there were no pain relief interventions thus far. *Id.* at 979–80. SAVAHCS progress notes through September 2014 track Plaintiff's diabetes and attempts for continuous disease control. *Id.* at 938–79. On October 24, 2014, Plaintiff was seen by Victor J. Bonuel, M.D. for a check-up, complaining of hip, lower back, and foot pain. *Id.* at 927–35. Dr. Bonuel's assessment included trigger finger, obesity, hypertension, hypertrophy, and hyperlipidemia. *Id.* at 931. On December 22, 2014, Plaintiff was seen by Monty Morales, M.D. at Pima Heart for a return office visit. AR at 799–802. Dr. Morales noted that Plaintiff was "doing well [and] exercising without

troubles." *Id.* at 799. Dr. Morales further noted that a recent carotid doppler was normal; Plaintiff's hypertension, hyperlipidemia, and 3 vessel coronary artery disease was stable. *Id.* at 801. Dr. Morales reported that Plaintiff's diabetes was managed by his primary care physician. *Id.* On December 29, 214, Dr. Eric Van Hoesen noted that Plaintiff "was recently discharged from CCHT management because he met the predefined treatment goals" regarding his diabetes. *Id.* at 917.

On May 14, 2015, Plaintiff was seen at SAVAHCS by Nicholas K. Cannella, M.D. AR at 909–14. Dr. Cannella reported Plaintiff's hypertension, diabetes, obesity, and hyperlipidemia were controlled. *Id.* at 911. Dr. Cannella further reported that Plaintiff's "[a]rthritis back with mild sciatica doing well with NSAID OTC aleve." *Id.* On June 3, 2015, Plaintiff returned to Dr. Morales for an office visit. *Id.* at 803–06. Dr. Morales noted that Plaintiff was "doing well and has no cardiac complaints." *Id.* at 803. Dr. Morales reported that Plaintiff's stress test was negative; his hypertension, hyperlipidemia, and limb pain were stable; and Plaintiff's diabetes was being managed by his primary care physician. AR at 805. On November 17, 2015, Francisco Rivera Pabon, M.D. at SAVAHCS reviewed Plaintiff's blood work, and reported that his diabetes was well-controlled. *Id.* at 908. On December 2, 2015, Plaintiff saw Dr. Morales for a return office visit. *Id.* at 807–09. Dr. Morales noted that Plaintiff was "doing well cardiac wise and has no complaints." *Id.* at 807. Dr. Morales further noted that Plaintiff had been having dental issues, was "not exercising regularly, but knows he needs to start." *Id.* Dr. Morales noted that Plaintiff's atherosclerotic heart disease, hyperlipidemia, and hypertension were all stable, and his Type 2 diabetes was without complications and managed by his primary care physician. AR at 809.

On February 26, 2016, Plaintiff was seen by Dr. Pabon at SAVAHCS for "management of [his] chronic conditions." *Id.* at 897–905. Dr. Pabon noted "no joint pain or stiffness[.]" *Id.* at 898. Dr. Pabon noted that there were no complications with Plaintiff's diabetes, and his hypertension was well controlled. *Id.* at 899. Regarding pain, Dr. Pabon checked "N/A". *Id.* On May 11, 2016, Plaintiff returned to Dr. Morales

for a check-up. *Id.* at 810–13, 1088–92. Dr. Morales reported that Plaintiff was "doing well and has no complaints." AR at 810, 1088. Plaintiff's stress test was negative for ischemia. *Id.* at 1088, 1092 Dr. Morales further reported that Plaintiff's hypertension and hyperlipidemia were stable, and his diabetes was managed by his primary care physician, without complications. *Id.* at 812, 1090.

On June 10, 2016, Plaintiff called reporting that his hips had been giving him trouble and causing pain. *Id.* at 891, 893. Plaintiff requested gabapentin instead of Advil. AR at 891, 893. Dr. Pabon entered a note that Plaintiff's Gabapentin prescription was discontinued in 2014, but that he would restart it. *Id.* at 888, 892. On June 14, 2016, Plaintiff had bilateral hip radiographs taken. *Id.* at 842. Alan M. Lesselroth, M.D. read the films and reported "[n]o acute fractures subluxations lytic or blastic osseous changes identified[;] [l]umbar spondylosis with suspected advanced degenerative disc and joint disease extends from L4 through S1[;] . . . [and] [m]ild arthritic changes of the sacroiliac and hip joints are present bilaterally[;] [t]he SI joints are patent." *Id.* Dr. Lesselroth's impressions included "[m]ild [degenerative joint disease] sacroiliac and hip joints[;] . . . [and] [s]ignificant degenerative changes of the lower lumbar spine as described[.]" *Id.* On June 16, 2016, Plaintiff had lumbosacral spine radiographs taken. AR at 840–41. Dr. Pabon read the films. *Id.* at 840. Dr. Pabon reported "[s]table mild wedging of the superior endplate of T12[;] . . . [m]oderate to advanced degenerative changes and narrowing at L4-L5, slightly advanced compared to prior[;] . . . [a]lignment of the spine does not shift significantly on flexion or extension positioning[;] . . . and [m]ild to moderate degenerative changes of the hips." *Id.* Dr. Pabon's impression noted "[s]light advancement of previous degenerative changes most pronounced at L4-5 and L5-S1 as described[;] [n]o shift in alignment of the vertebral bodies on flexion or extension positioning." *Id.* Dr. Pabon ordered physical therapy for pain management. *Id.* at 888, 1063. On September 8, 2016, Plaintiff underwent a magnetic resonance imaging ("MRI") scan. AR at 1059, 1064, 1066–67, 1082–83. Dr. Pabon noted that the MRI showed "evidence of degenerative disc disease without evidence of nerve impingement

or spinal canal stenosis." *Id.* at 1059, 1064. Plaintiff was instructed to "please [] continue with physical therapy exercises." *Id.* Dr. Pabon further noted that the "[c]hanges noted in MRI are not amenable for surgical procedure." *Id.*

On March 2, 2017, Plaintiff saw Dr. Pabon for a check-up. *Id.* at 1133–44. Plaintiff reported continued "low back pain, sharp, 3–7/10 in intensity, constant, no radiation, without associated signs or symptoms, despite taking gabapentin 1200 mg a day[.]" AR at 1034. Dr. Pabon increased Plaintiff's gabapentin. *Id.* at 1136. On April 17, 2017, Dr. Morales completed a Cardiac Questionnaire. *Id.* at 1095–98. Dr. Morales noted that Plaintiff was limited in his walking and sitting for long periods during routine activities. *Id.* at 1095. Dr. Morales further identified symptoms of back and foot pain, shortness of breath, fatigue, and weakness. *Id.* Dr. Morales opined that Plaintiff had marked limitation of physical activity. AR at 1095. Dr. Morales further opined that stress contributed to Plaintiff's symptoms, and that he was incapable of even low stress jobs. *Id.* Dr. Morales limited Plaintiff's grasping, turning, and twisting of objects; fine manipulations; reaching with his arms; and bending and twisting at the waist to thirty-three (33) percent of the work day. *Id.* at 1096. Dr. Morales opined that Plaintiff should avoid extreme cold and heat; high humidity; fumes, odors, dusts, gases; cigarette smoke; soldering fluxes; solvents and cleaners; and chemicals. *Id.* Dr. Morales noted that he expected Plaintiff to be absent from work more than twice per month. *Id.* Dr. Morales indicated that Plaintiff's physical symptoms cause emotional difficulties, and emotional factors contribute to the severity of his pain. AR at 1097. Dr. Morales described side effects of Plaintiff's medication as myalgia, fatigue, and frequent urination. *Id.* Dr. Morales expected Plaintiff's symptoms to last more than twelve (12) months. *Id.* Dr. Morales stated that Plaintiff could not walk an entire city block; could sit or stand for fifteen (15) minutes continuously; sit or stand less than two (2) hours out of an eight (8) hour work day. *Id.* Dr. Morales opined that Plaintiff required a job which permits shifting positions, and that his legs should be elevated above his waist during periods of prolonged sitting. *Id.* at 1098. Dr. Morales noted that Plaintiff required a back brace, and

could occasionally lift ten (10) pounds.  AR at 1098.

**b. Examining physical therapist**

On August 27, 2013, Vanessa Morton, PT, DPT examined Plaintiff.  AR at 789–94.  Ms. Morton noted Plaintiff's report of "chronic history of low back and bilateral hip pain for [approximately] 4 years[;] . . . degenerative arthritis in low back and hips[;] . . . tendinitis in bilateral shoulders and arthritis in hands ([right greater than left]) and trigger finger in right thumb[;] [h]e is right handed[;] . . . has history of Diabetes and was diagnosed with neuropathy in bilateral [lower extremities, approximately] 3 years ago." *Id.* at 793.  Ms. Morton further noted Plaintiff's reported pain aggravated by walking more than fifteen (15) minutes; standing more than ten (10) minutes; sitting longer than thirty (30) minutes; bending forward; lifting more than ten (10) pounds; and difficulty gripping and manipulating objects. *Id.*  Ms. Morton noted that Plaintiff reported that the pain radiates from his low back to anterior thigs and lower legs, with occasional numbness in his anterior lower legs. *Id.*

Ms. Morton reported that Plaintiff ambulated without an assistive device, demonstrated decreased cadence and stability in the frontal plane and increased trunk flexion; ascended and descended stairs with a reciprocal gait pattern, but demonstrated decreased stability in frontal plane and reported hip pain. *Id.*  Ms. Morton's examination of Plaintiff showed full shoulder flexion active range of motion; lumbar flexion and extension movement limited to 50%; lumbar left and right side bending movement limited to 75% and 50% respectively; and lumbar rotation left and right limited to 50%.  AR at 793–94.  Ms. Morton also noted limitations associated with internal and external rotation and flexion of Plaintiff's hips. *Id.* at 794.

After her assessment, Ms. Morton completed a residual functional capacity assessment. *Id.* at 789–92.  Ms. Morton reported observing moderate pain in Plaintiff's low back and hips with standing and lifting activities, and moderate pain in his shoulders with activity and reaching.  *Id.* at 789.  Ms. Morton did not find Plaintiff to be a malingerer. *Id.*  Ms. Morton opined that Plaintiff could walk one (1) city block without

rest or severe pain; could sit for thirty (30) minutes before needing to get up; and could stand for ten (10) minutes at one time. AR at 789–90. Ms. Morton further opined that Plaintiff could sit for approximately four (4) hours and stand for about two (2) hours in an 8-hour day. *Id.* at 790. Ms. Morton also opined that Plaintiff would need a job that permitted shifting positions and periods of walking around, indicating the Plaintiff must walk every thirty (30) minutes for ten (10) minutes. *Id.* Ms. Morton indicated that Plaintiff would need to take unscheduled breaks during a work day to change positions due to pain. *Id.* Ms. Morton reported that Plaintiff did not require an assistive device, and could occasionally lift less than ten (10) pounds; rarely lift ten (10) to twenty pounds; and never lift fifty (50) pounds. *Id.* at 791. Ms. Morton opined that Plaintiff should never twist or climb ladders, and should rarely stoop or bend; crouch or squat; and climb stairs. AR at 791. Ms. Morton further limited the amount of time Plaintiff could grasp, turn, or twist objects with his hands and reach with his arms in front of his body to less than ten (10) percent of an eight (8) hour day. *Id.* Ms. Morton noted that fine manipulation should be limited to less than twenty-five (25) percent of Plaintiff's work day, and he should never reach overhead. *Id.*

## II.      STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d

871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III. ANALYSIS

### A. *The Five-Step Evaluation*

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). This process is defined as follows: Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]" If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work. If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience. If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2016, and was not engaged in substantial gainful activity since his alleged onset date of December 31, 2010 through his date last

insured.  AR at 476–77.  At step two of the sequential evaluation, the ALJ found that "the claimant had the following severe impairments: diabetes and degenerative disc disease (20 CFR 404.1520(c))."  *Id.* at 477.  At step three, the ALJ found that "the claimant does not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526)."  *Id.*  Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following limitations:   Claimant can occasionally climb ladders/ropes/scaffolds; frequently climb ramps/stairs, stoop, kneel, or crouch; and occasionally crawl."  *Id.*  At step four, the ALJ found that "the claimant was unable to perform any past relevant work (20 CFR 404.1565)."  *Id.* at 479.  At step five, "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, the claimant had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a) and 404.1568(d)).  AR at 480.  Accordingly, the ALJ determined that Plaintiff was not disabled.  *Id.* at 482.

Plaintiff asserts that the ALJ erred in failing to appropriately evaluate the medical opinion evidence and her credibility assessment was generally deficient.  Pl.'s Br. (Doc. 17) at 1, 12–20.

### B.     *Treating Physician Opinion*

Plaintiff asserts that the ALJ did not provide clear and convincing reasons for rejecting the opinions of Ms. Morton and Dr. Morales.  Pl.'s Br. (Doc. 17) at 15–18.  Conversely, the Commissioner asserts that the ALJ properly evaluated the opinions and weighed them accordingly.  Def.'s Response (Doc. 18) at 2–9.

### 1. Legal Standard

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."  *Lester v. Chater*, 81 F.3d

821, 830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)); *see also Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citations omitted)). "The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Embrey*, 849 F.2d at 421 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Moreover, "[e]ven if a treating physician's opinion is controverted, the ALJ must provide specific, legitimate reasons for rejecting it." *Id.* (citing *Cotton*, 799 F.2d at 1408). Additionally, "[a] physician's opinion of disability 'premised to a large extent upon the claimant's own account of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" *Morgan*, 169 F.3d at 602 (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citations omitted)). "Similarly, an ALJ may not simply reject a treating physician's opinions on the ultimate issue of disability." *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014). "[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. § 404.1527(c)(4).

### **2. Monty Morales, M.D.**

Regarding Dr. Morales's records and opinions, the ALJ observed that Dr. Morales "submitted a cardiac questionnaire indicating the claimant could perform less than sedentary work activity." AR at 477 (citations omitted). The ALJ went on to find that

she gave "no weight to this opinion as the last cardiac related treatment records indicate the claimant had 'no symptoms attributable to valvular heart disease.'" *Id.* (citations omitted). Moreover, Dr. Morales noted Plaintiff "to be 'doing well' and has 'no complaints.'" *Id.* The ALJ's findings are consistent with the medical records in this case. As such, the ALJ provided "'specific and legitimate reasons' supported by substantial evidence in the record" to reject Dr. Morales's Cardiac Questionnaire. *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001). Accordingly, she did not err.

### 2. Vanessa Morton, PT, DPT

The ALJ gave "[l]ittle weight . . . to the physical therapist residual functional capacity assessment dated August 27, 2013 indicating the claimant cannot work even an 8 hour workday." AR at 479 (citations omitted). The ALJ observed that "[t]herapist Morton examined the claimant apparently solely for the purpose of completing the assessment form as there are no subsequent physical therapy records from her, and her limitations appear to be based on the claimant's self-reports of his abilities." *Id.* The ALJ found that "[t]he medical evidence described above reflects the claimant would not be limited to less than sedentary work activity." *Id.*

Indeed, Plaintiff testified that he only saw Ms. Morton one time. *Id.* at 513–14. Moreover, although more weight is given to a source who has examined a Plaintiff, such an opinion is properly rejected for "specific and legitimate reasons . . . based on substantial evidence in the record." *Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989) (citations omitted) (alterations in original). The ALJ's review of Plaintiff's medical record, as well as her observation that Ms. Morton's opinion was based upon claimant's self-report, are specific and legitimate reasons sufficient to support her finding.

### C. Plaintiff's Symptoms

Plaintiff asserts that the ALJ's failure to consider his strong work history is legal error. Pl.'s Br. (Doc. 17) at 19–20. Defendant asserts that "[t]he ALJ provided legally sufficient reasons for discounting Plaintiff's statements." Response (Doc. 18) at 10.

## 1. Legal standard

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). First, "a claimant who alleges disability based on subjective symptoms 'must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged[.]'" *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014). Further, "the claimant need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282 (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen*, 80 F.3d at 1282). "[I]f the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v. Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and convincing" requirement had been excised by prior Ninth Circuit case law). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

"Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and 'unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment.'" *Orn v. Astrue*, 495 F.3d 625, 636

(9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)); *see also Ghanim*, 763 F.3d at 1163. The Ninth Circuit Court of Appeals has "repeatedly warned[, however,] that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016 (citations omitted). Furthermore, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." *Smolen*, 80 F.3d at 1287 n. 7 (citations omitted). The Ninth Circuit Court of Appeals has noted:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Garrison*, 759 F.3d at 1016 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)) (alterations in original). "While ALJs obviously must rely on examples to show why they do not believe that a claimant is credible, the data points they choose must *in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard." *Id.* at 1018 (emphasis in original) (discussing mental health records specifically). "Inconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination. *Burrell*, 775 F.3d at 1137 (citing *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997)).

## 2. ALJ findings

Here, the ALJ acknowledged the two-step process for assessing Plaintiff's symptom testimony. AR at 477–78. The ALJ then found "[a]fter careful consideration of the evidence, [the undersigned] find[s] that the claimant's medically determinable

impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *Id.* at 478. The ALJ went on to review the medical record concluding that "while [the undersigned] ha[s] no doubt that the claimant experiences symptoms that he has alleged, his symptoms are not so severe as to prohibit him from performing all work activities." *Id.* at 479.

In her analysis, the ALJ reviewed Plaintiff's medical records and considered the treatment that was recommended, as well as his own statements to doctors which included daily exercise. *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007) ("whether the claimant engages in daily activities inconsistent with the alleged symptoms" is a proper factor for assessing a claimant's subjective pain and symptom testimony). Furthermore, "evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra v. Astrue,* 481 F.3d 742, 751 (9th Cir.2007) (citations omitted). The ALJ's "credibility finding is supported by substantial evidence in the record, [and as such,] we may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citations omitted).

## V.    CONCLUSION

Based upon the foregoing, the Court affirms the ALJ's decision. Accordingly, IT IS HEREBY ORDERED that:

1)    Plaintiff's Opening Brief (Doc. 17) is DENIED;

2)    The Commissioner's decision is AFFIRMED; and

3)    The Clerk of the Court shall enter judgment, and close its file in this matter.

Dated this 28th day of September, 2018.

Honorable Bruce G. Macdonald
United States Magistrate Judge